# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NATALIE GOLZER,                 )
                                )
          Plaintiff,            )
                                )          09 C 1847
     v.                         )
                                )          Magistrate Judge Jeffrey Cole
MICHAEL J. ASTRUE,              )
Commissioner of Social Security,)
                                )
          Defendant.            )
                                )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Natalie Golzer, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c(a)(3)(A). Ms. Golzer asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

In her August 2004 application for SSI, Ms. Golzer alleged that she had become disabled on July 24, 2002, due to an injury to her spine. (Administrative Record ("R.") 73-74, 82). Her application was denied initially and also upon reconsideration. (R. 39, 40-45, 50-53). Ms. Golzer continued pursuit of her claim by filing a timely request for a hearing. An administrative law judge ("ALJ") convened a hearing on September 14, 2006, at which Ms. Golzer, represented by counsel, appeared and testified. (R. 349-379). On February 22, 2007, the ALJ found that Ms. Golzer was not disabled because she retained the capacity to perform sedentary work that existed in significant numbers in the economy. (R. 277-82).

Ms. Golzer requested a review of the decision and on May 25, 2007, the Appeals Council remanded the case to the ALJ. (R. 287-90). The Appeals Council instructed the ALJ to obtain additional evidence regarding Ms. Golzer's condition post surgery for her lumbar disc and post spinal fusion surgery. (R. 289). They also required that the ALJ make a new credibility finding following the applicable regulations and Social Security Rulings, that he further consider Ms. Golzer's residual functional capacity, and obtain evidence from a medical expert. (R. 289). Finally, if the expanded record warranted, the Appeals Council wanted evidence from a vocational expert as well. (R. 289).

With his new charge, the ALJ conducted a second hearing on May 6, 2008. (R. 380-419). Ms. Golzer testified again, and was joined this time by Roland Manfredi, who testified as a medical expert, and Thomas Dunleavy, who testified as a vocational expert. (R. 380). There was essentially no change in the result: this time, on June 12, 2008, the ALJ decided that Ms. Golzer was not disabled because she could perform her past work as a secretary, which was sedentary work, although he also thought she could perform medium work. (R. 19-25). This became the Commissioner's final decision when the Appeals Council denied Ms. Golzer's request for review on February 20, 2009. (R. 6-9). Ms. Golzer has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD
### A.
### Vocational Evidence

Ms. Golzer was born on August 22, 1964, making her forty-three years old at the time of the ALJ's decision. (R. 109). She only made it through the tenth grade in school

(R. 88), but later obtained a GED. (R. 356). In her application statement, she said she last worked in December 1997, and that since then she has been a stay-at-home mom. (R. 82). Her last job was as a secretary, which required about 6 hours a day of sitting and an hour and a half of standing. (R. 83). The heaviest weight she had to lift was 20 pounds. She only had to do this about five minutes a day, however, and the balance of the day she didn't have to lift anything. (R. 84). At her hearing, she said that she worked until February 2002, running a small paving business with her husband. (R. 357). She handled account management, site inspection, payroll, and the like. (R. 357).

## B.
## Medical Evidence

The medical record, which is assembled in no discernible order, appears to date back to May 21, 2002. At that time, Ms. Golzer had already been suffering severe low back pain and right leg sciatica secondary to lumbar disc herniation and mechanical lumbar instability for a while. (R. 185, 204). She was treated conservatively for a time, but these efforts failed. (R. 185). At that point, she underwent a spinal laminectomy at the L5-S1 level. (R.199-205). As it turned out, however, that failed to provide relief as well. (R. 183).

So, it was back to surgery for Ms. Golzer on July 24, 2002; this time, a spinal fusion at L5-S1 and a revision laminectomy at L5-S1, with titanium rods and screws inserted bilaterally. (R.188-90). Again, however, there was no long-term relief. Ms. Golzer developed increasing pain post-operatively.

From June 2003 through mid-December 2006, Ms. Golzer sought treatment at the Pain Management Clinic at Loyola University Health System. (R. 146-78, 206-56, 257-73). Dr. Vikram Patel diagnosed post-laminectomy syndrome with right L4, L5

3

radiculopathy on November 5, 2003. (R. 178.). Ms. Golzer had a myelogram of her lumbar spine in October 2004, and that revealed hypoplastic ribs at L1 and hypertrophy of the ligamentum flavum at level L-4 with minimal spinal stenosis. (R. 266-267). A July 7, 2005 myelogram showed the same abnormalities. (R. 266-67). Additional findings included sequelae or effects of plaintiff's back surgery and thickening of the nerve roots of the cauda equine, with minimal disc bulge at L3-4 and L4-5. (R. 266-67). There was a possibility of arachnoiditis, but there was no significant nerve root clumping upon evaluation. (R. 222).

Ms. Golzer underwent epidural steroid injections and management of pain medication while under the care of Dr. Candido from September 2005 until December, 2006. Dr. Patel performed a series of three transforaminal steroid injections at L4-S1 and at L4-L5. (R. 228, 178). Dr. Candido ordered two transcaudal epidural steroid injections performed with a Racz catheter. (R. 226,233). In October 2005, Ms, Golzer exhibited a limited range of motion in terms of flexion (70 degrees) and extension (20 degrees). She walked with a slight limp on the right side. Straight leg raising was positive on the right side at 30 degrees. (R. 209). Dr. Candido diagnosed Ms. Golzer with low back pain secondary to post laminectomy syndrome of the lumbar region. (R. 209).

On February 10, 2006 an MRI of the lumbar spine revealed postoperative changes compatible with posterior fusion at the L5-S1 level. Abnormal findings included Schmorl's nodes of the inferior endplates of L2 and L3 and superior endplate of L3; and degenerative disk disease at 6 intervertebral levels involving L5-S1, L4-5, L3-4, L1-2, and T12-L1. (R. 264). Ms. Golzer continued regular follow-up visits to the pain management clinic, complaining of lower back pain radiating into her right buttock

through her groin, down her right leg mostly through the calf muscle and extending down into the dorsal part of her right foot. (R. 173, 174, 175, 208, 210, 211, 222, 225, 230-231, 232, 236, 246, 248, 255, 256, 263, 305, 319, 323, 333, 364.). On some occasions, she described it as a stabbing or shooting pain (R. 211, 225, 248). She also complained of difficulty walking or standing. (R. 225, 232). Sometimes she experienced muscle spasms in her back (247-248), and more frequently in her calf. (R. 231, 230, 232, 253). She also complained of numbness or loss of sensation in her right leg or right foot (R.208, 230, 248), and loss of sensation or muscle weakness in her leg or foot (R. 248, 319). She stated that before her back surgery the pain was at the level of 5 or 6 out of a scale of 10 (R. 225), but that though she had some good days, after her back surgeries her pain dramatically worsened to the level of 8 out of 10. (R. 225)

On February 8, 2006, Dr Candido's physical examination of Ms. Golzer said that the muscles of her right calf were in "perpetual spasm" (R. 263) but the muscle relaxer – Baclofen[1] – she had been taking for muscle cramps had too much of a sedating effect. (R. 263). Ms. Golzer also frequently complained that any increase in activities intensified her pain and made it much worse. (R. 230-231, 209, 230, 231, 261, 258). Ms. Golzer complained that pain relief might occur but it would either be short-lived or she would be lulled into thinking she could resume more of a normal life and then she would invariably pay for it by increased pain and visits to the pain clinic. (R. 230, 231, 236, 253, 362). She said narcotics like Valium or Lortab made her feel sleepy or "out of it." (R. 245, 369, 398). On the other hand, Ms. Golzer complained that her pain affected her sleep, causing her to wake in the middle of the night. (R. 225, 360-361).

---

[1] Throughout this opinion, information regarding prescription medications is drawn from www.drugs.com.

On May 19, 2006, Dr. Ibrahim reported that Ms. Golzer had experienced a lot of pain "reaching/playing with basketball." She had no limp, but experienced pain at 90 degrees flexion and at 15 degrees extension. (R. 261). Medications – Ultram, a narcotic-like pain reliever, and a patch – were not helping with breakthrough pain. (R. 261).

Ms. Golzer was doing well as of July 17, 2006, as she had decreased her activities. Her pain was 3-4/10, when on an average day it could be 8/10. Increased pain came with activity, such as lifting or carrying. There was pain at 90 degrees flexion, 15 degrees extension, as well as decreased sensation in both legs, worse on the right. (R. 258). Toward the end of 2006, Ms. Golzer began experiencing upper back pain; it hurt to breathe. (R. 324).

A doctor at the pain management clinic, Dr. Thomas Ratino, examined Ms. Golzer on November 26, 2006. Her range of motion in her back was decreased by pain in all directions. Straight leg raising was positive on the right. There were no motor or sensory deficits, but there were trigger points all along paraspinous muscles. Strength in the right leg was decreased, perhaps due to pain. It was thought that Ms. Golzer might be a good candidate for a subcutaneous nerve stimulator. (R. 323).

Ms. Golzer underwent a pain management evaluation on March 6, 2007. Her responses indicated "beliefs that interfere with rehabilitation goals" and "significant anxiety and somatic preoccupation." (R. 317). There was no indication that Ms. Golzer was misusing pain medication. (R. 317). Her lumbar range of motion was essentially normal, save for pain upon backward bending and 25% decrease in left rotation. (R. 318). Her strength in her extremities was 4+ or 5 out of 5 throughout. (R. 320-321). She

was able to lift no more that ten pounds from the floor with both hands, and could carry no more than five pounds for twenty feet. (R. 321).

Ms. Golzer asked to discontinue Vicodin in May of 2007, despite the fact that she continued to experience pain and muscle spasm in her back. (R. 338). It was then that she started on Lyrica, and Toradol apparently replaced the Vicodin. (R. 339). In July of 2007, Ms. Golzer reported that her new medication was "amazing." (R. 336). She felt great, and was able to do things with her children. (R. 336). On October 2, 2007, Ms. Golzer went into the health center with continued complaints of low back pain radiating to her right leg, as well as new pain between her shoulders. (R. 333). At her December 9, 2007 visit to the health center, Ms. Golzer said she felt "so good," and could "now do things with her children. . . . coaching BB." (R. 329).

On January 31, 2008, the Agency arranged for Dr. Charles O'Laughlin to examine Ms. Golzer. He noted that she was unable to sit comfortably throughout the examination, having to shift off of her right side to relive pain. (R. 304). She could walk fairly well without a limp. (R. 304). She could bend forward just 64 degrees and extend 15. Right side bending was more limited than left. Reflexes were normal. Straight leg raising was positive in supine position, negative in seated position. (R. 305). Dr. Laughlin noted that Ms. Golzer could not tolerate her pain and was unable to cope with what he called a minimal degree of paraesthesias. Strength was good and exam was normal as far as any evidence of significant nerve root impingement. He thought she simply did not have good tolerance to handle the minimal dysfunction that she had. (R. 307). The doctor felt she could lift or carry up to 50 pounds occasionally and 20 pounds frequently. (R. 308). She could sit for 3 hours at a time, stand for 2, and walk for 1. (R.

309). But he also said she could sit or stand for a full eight hours in an eight-hour day. (R. 309).

On March 7, 2008, Ms. Golzer reported that her pain increased with standing and activity, but said that her "quality of life last year 'wonderful.'" (R. 327). She was still taking Lyrica, and was also on Ultram. (R. 328).

## C.
### Administrative Hearing Testimony

#### 1.
#### Plaintiff's Testimony

At her first hearing, Ms. Golzer testified that she last worked in the family paving business in February 2002. (R. 357). That was when she began seeing the doctor about her back pain and discovered she had a herniated disc. (R. 357). She had a laminectomy and eventually a spinal fusion, but has never been the same. (R. 357). Doctors thought they should perform yet another procedure, essentially remove all the "hardware" from the spinal column, but Ms. Golzer had qualms about further operations, and her insurance would not cover it. (R. 357, 395). Eventually, due to her loss of insurance, she had to leave the doctor she felt was most effective. (R. 393). After that, it was physical therapy and epidural steroids. (R. 358). Then, she could no longer tolerate physical therapy. (R. 358).

Ms. Golzer said she could sit for about ten minutes before experiencing intense groin and leg pain. (R. 359). She could stand for about ten minutes before she needed to sit down due to leg and back pain. (R. 359). She thought she could walk about a block. (R. 359). She could lift perhaps two or three pounds; she was very careful about lifting anything for fear of suffering pain. (R. 360). Her son and her mother helped her out at

8

home. (R. 360). She was distraught that she was unable to play with her son anymore. (R. 360). She had problems climbing stairs, bending and stooping, and sleeping at night. (R. 360-61). She sometimes could drive a car, but usually didn't do any shopping. (R. 362). She used a laptop during the day, but did so lying down on a heating pad. (R. 363). She also read books. (R. 363). She didn't go to restaurants or movies because she could not sit for that long. (R. 371). She even had to leave her last Thanksgiving dinner early. (R. 372).

At the time of the first hearing, Ms. Golzer was on several prescription medications: a 75 milligram duragesic patch every 72 hours (long-term, continuous narcotic relief of chronic pain), Ibuprofen as needed, Ultram three times a day (narcotic-like relief of severe pain). (R. 361). Side effects from this regimen included drowsiness and fatigue. (R. 361). Ms. Golzer thought that things were getting worse for her, as opposed to better or even stabilizing. (R. 363). It seemed to her she was building up a tolerance to pain medication and it wasn't as effective. (R. 370).

By the time of her second hearing, Ms. Golzer said she could stand only five minutes and sit comfortably for about ten – or fifteen on a good day. (R. 390, 393). She could walk a block or two (R. 390), but wouldn't chance walking to the grocery store that was a block away. (R. 92). She avoided lifting, but thought she could lift twenty pounds or whatever her cat weighed – she didn't seem certain. (R. 390, 397). Any lifting at all, though, caused her to suffer. (R. 390). She could sleep for only about four hours a night. (R. 393). She was taking Ultram, Ibuprofen, and Lyrica, which is an anti-seizure medication also used to control fibromyalgia and nerve pain. (R. 390). The Lyrica helped her cope with her pain, but caused her to be drowsy and dizzy. (R. 391). She

tried to do stretching exercises for therapy. (R. 392). Her two sons, who were thirteen and eighteen, helped with grocery shopping. (R. 392). They helped with anything that required lifting: opening the trunk of the car, carrying the laundry, laundry detergent, grocery bags, soda pop, and milk. (R. 396). She continued to read a lot, and use her laptop while lying down. (R. 393). She still didn't go out to movies, but would go out to dinner occasionally if there was a big event. (R. 394).

## 2.
### Medical Expert's Testimony

After reviewing the medical evidence and listening to Ms. Golzer's testimony, Dr. Roland Manfredi testified. He called it a complicated case. (R. 400). He said that while one doctor thought the spinal fusions hardware had to be removed, others did not. (R. 401, 402, 403). Her objective examinations did not suggest she was severely impaired: strength and sensation were intact, and range of motion was limited by pain but not functionally. (R. 401). Dr. Manfredi said she did have serious pain. (R. 402). All her limitations were due to pain. (R. 402). She had mild disc bulging up and down her spine all the way from T12 to L5. (R. 402). But there was no stenosis of the spinal canal or nerve root impingement. (R. 402, 404). Dr. Manfredi classified Ms. Golzer's condition under listing 1.04(C) of the Listing of Impairments, because of the pain she experiences, "although the objective examination shows that she can do most of the tests except for experiencing pain." (R. 403). He said her symptoms of pain could not be denied (R. 405); they had to be accepted, and "for that reason, she does fit into some of those categories, although the supportive evidence is minimal." (R. 403). Dr. Manfredi explained that he chose 1.04(C) because Ms. Golzer does have "medically accepted imaging manifested by non-radicular pain . . . resulting in inability to ambulate effectively." (R. 404).

Then Dr. Manfredi considered what Ms. Golzer's residual functional capacity might be. He said he was inclined to accept Dr. O'Laughlin's findings that she could walk for a block and lift between 21 and 50 pounds. (R. 406). This was based solely on the objective medical evidence, because her pain would limit her ability to do that satisfactorily. (R. 406). Dr. Manfredi also felt that when Ms. Golzer took narcotic pain medication, she would not be able to maintain attention at the workplace. (R. 412). There was objective pathology in the record that could account for some pain, but the doctor seemed to feel that Ms. Golzer's allegations of pain might be exacerbated by either a low tolerance or anxiety. (R. 408). As he put it: "Some people can go to work and have pain and some people cannot. And apparently, that's what we have here." (R. 411). Dr. Manfredi also said that she would have been severely limited, however, for about a year after her surgery. (R. 407).

### 3.
### Vocational Expert's Testimony

Thomas Dunleavy then testified as a vocational expert. He characterized Ms. Golzer's past work as a secretary as skilled and sedentary. (R. 413). He said that Ms. Golzer had worked in a variety of secretarial positions that were sedentary and semi-skilled. (R. 68-69). In response the ALJ's questioning, he said that a person who could lift between 21 and 50 pounds could perform Ms. Golzer's past work. (R. 414). But, if a person could only sit for about ten minutes and stand for five on a "bad day" -- if Ms. Golzer's testimony were credited -- such work would be precluded. (R. 415). But such an individual could perform cashier jobs with a sit-stand option, of which there were 3000 in the region, bench assembly jobs, of which there were 4000, and inspection jobs, of which there were 2000. (R. 415). The VE added, however, that as he observed Ms.

Golzer – bracing herself with both hands in her chair and squirming throughout the hearing – such a person would not be able to perform work on a regular basis. (R. 416-17).

## D.
## ALJ's Decision

The ALJ found that Ms. Golzer suffered from a spinal impairment, and her status was post spinal trauma and left femur fracture. (R. 23). These were both severe impairments as defined by the regulations. (R. 35). The ALJ further found that Ms. Golzer did not have an impairment or combination of impairments that met the Listings, specifically focusing on listings 1.03 and 1.04, because she did not have clinical signs and findings that met the specific criteria. (R. 23). On this topic, the ALJ noted that Dr. Manfredi "opined that the claimant's impairments do not meet listing 1.04 since there is no evidence of nerve root impingement." (R. 22).

Next, the ALJ determined that Ms. Golzer could perform medium work including lifting up to 50 pounds occasionally and carrying up to 25 pounds frequently, with the added restriction of no more than occasional balancing, stooping, kneeling, crouching and crawling. (R. 23). The ALJ pointed to a December 2006 evaluation indicating Ms. Golzer was capable of sedentary work, and Dr. O'Laughlin's evaluation indicating that Ms. Golzer had a residual functional capacity for up to medium work. (R. 24). He also noted that none of Ms. Golzer's treating physicians said she was disabled. (R. 24). The ALJ adopted the findings of Dr. O'Laughlin. (R. 25).

The ALJ thought that Ms. Golzer's testimony, "when compared against the objective evidence and evaluated using the factors in SSR 96-7p, was not credible." (R. 24). He noted that she read a lot and traveled by car, including seeing a doctor in

Indiana. (R. 24). He further noted that in December 2007, she reported to a physician that she was feeling "so good" she was able to do things with her children and was coaching basketball, and in March 2007, she stated that her quality of life over the preceding year was "wonderful." (R. 24).

Given the residual functional capacity that Dr. O'Laughlin found, the ALJ stated that the VE determined that Ms. Golzer would be able to perform her past sedentary work as a secretary. (R. 25). The ALJ relied on this testimony and determined that Ms. Golzer could perform her past relevant work. (R. 25). Accordingly, he concluded that Ms. Golzer was not disabled. (R. 25).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the

court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Ms. Golzer's claim is all about the level of pain she experiences. That makes this a difficult case. Pain can be severe to the point of being disabling even though it has no diagnosable cause and thus is entirely in the patient's mind. *Johnson v. Barnhart*, 449 F.3d 804, 806-07 (7th Cir. 2006); *Sims v. Barnhart*, 442 F.3d 536, 537-38 (7th Cir.2006); *Carradine v. Barnhart*, 360 F.3d 751, 753-54 (7th Cir.2004). In a Social Security disability case, an ALJ cannot disbelieve a claimant's allegations as to the level of pain they experience "'solely because it seems in excess of the "objective" medical testimony.'" *Johnson v. Barnhart*, 449 F.3d 804, 806-07 (quoting *Schmidt*, 395 F.3d at 746-47). Significantly, the ME repeatedly testified that Ms. Golzer's pain was very real: "She does have serious pain . . . ." (R. 402); ". . . I did classify her as disorders of the spine 1.04 and I gave her a 'C' classification because of her pain . . . ." (R. 403); ". . . we do have to accept her pain . . ." (R. 403); ". . . I could not deny her that symptom that she suffers from considerably and use that to evaluate her problem." (R. 404). Indeed, the

ME found Ms. Golzer's pain sufficiently serious to suggest that she *de facto* met listing 1.04(C), although she did not meet it *de jure*, because she did not present the objective findings that listing demands. The ALJ glossed over this distinction in his decision, saying simply that Dr. Manfredi testified that Ms. Golzer did not meet the listing. Now, Ms. Golzer may have a low tolerance for pain; the ME intimated as much. But that doesn't necessarily mean her pain is not disabling. Peoples' thresholds to pain are far from uniform. *Johnson*, 449 F.3d at 806.

The ALJ said he didn't believe Ms. Golzer based upon the objective medical evidence and the considerations enumerated in SSR 96-7p. Under that ruling, the ALJ first decides whether the pain is substantiated by medical evidence. *See* SSR 96-7p at 2; *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir.2003). As already noted, an ALJ can't just reject allegations of pain that are unsupported by objective medical evidence out of hand, but a discrepancy between the degree of pain claimed and that suggested by medical record is probative of exaggeration. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). It seems that the ALJ believed that Ms. Golzer's pain – at least *some* level of pain – was substantiated by the evidence. He found her limited to medium work, after all, even though that is not a very significant limitation. So it fell to the ALJ to consider the factors enumerated in SSR 96-7p. But he certainly rejected the extent of her complaints; he thought she was exaggerating.

If the alleged pain is not substantiated by the medical evidence, the ALJ evaluates the effects of the alleged pain on the individual's functional ability to work, taking into account the claimant's daily activities; past work history and efforts to work; the dosage, effectiveness, and side effects of medication; the nature and intensity of the reported

pain; medical evidence from treating physicians and third parties; medical evidence and laboratory findings; and the course of treatment. SSR 96-7p at 3, 5; *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir.2004). It's not enough for the ALJ to just pay lip service to this list of factors; he must discuss them. *Arnold v. Barnhart*, 473 F.3d 816, 822-23 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). Here, the ALJ gave short shrift to a couple of the factors that prove to be significant.

The ALJ mentioned a few of Ms. Golzer's daily activities. He noted that she dribbled and shot a basketball a single time on one occasion, but saw the doctor with pain the following day. (R. 21). He related that she could not cook, clean, do laundry, or grocery shop. She never risked walking to the store which was just a block away. (R. 21). He said she used a laptop and read, but didn't mention that she did that lying down. (R. 21). The ALJ cited to two reports from late 2007 and early 2008 that indicated that Ms. Golzer was doing well, doing some things with her children like coaching "BB" and that her quality of life was "wonderful." (R. 24).

The Seventh Circuit has consistently cautioned ALJs against putting too much stock in daily activities like reading, watching television, and doing a little house work. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 669, 680 (7th Cir. 2008); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir.2006). "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez*, 439 F.3d at 362. Ms. Golzer can't even accomplish the few household chores she attempts without significant restrictions like lying down or requiring help, or consequences like a trip to the doctor. An ALJ cannot disregard a

claimant's limitations in performing household activities. *Moss*, 555 F.3d at 562; *Craft*, 539 F.3d at 668; *Mendez*, 439 F.3d at 362. The ALJ certainly did that here.

That's not to say that there are not many instances where an ALJ will have solid grounds for disbelieving a claimant who, like Ms. Golzer, testifies that she has continuous, agonizing pain. *Johnson*, 449 F.3d at 806. In *Schmidt v. Barnhart*, 395 F.3d at 747, cited as an example in *Johnson*, the ALJ found that the claimant's "daily living activities were not significantly restricted, that he was not receiving any active treatment or therapy for his conditions at the time of the hearing, that he was not using any prescription medication, and that his alleged pain did not prevent him from engaging in substantial gainful activity for several months after he allegedly became disabled." *Id.* Of course, that situation has nothing to do with Ms. Golzer, whose activities are significantly curtailed, who is constantly seeking treatment, who is using strong pain killers, and who has not worked at all since her alleged onset date. And in *Johnson*, the claimant's painful skin lesions had responded to treatment, and that she continued working as a car washer for four years after being diagnosed with sarcoidosis. 449 F.3d at 807. Again, that claimant has nothing in common with Ms. Golzer.

As for Ms. Golzer's response to treatment – her improved quality of life – the record does suggest that, at least for a time at the end of 2007, things were getting better for her. But that is evinced by just two or three clinical notes at the end of a long tale of woe. Prior to that time, in note after note and in doctor's report after doctor's report, she was consistently suffering from severe back pain radiating down her right leg that was made worse with almost any activity. After conservative treatment failed, she underwent two back surgeries, including a spinal fusion. The medical expert testified that that

surgery would take at least a year to heal. (R. 407). Whether Ms. Golzer was ready to lift up to fifty pounds, carry twenty, and sit, stand and walk right then – which is what the ALJ found – is another matter entirely.

The objective medical evidence demonstrates that even after surgery she had bulging discs from her thoracic spine to her sacral spine. (R. 264). So her problems were not solved. More surgery was contemplated. She began a regimen of repeated edipurals and strong narcotics, including a duragesic patch. Strong painkillers, epidurals, a spinal fusion, and a laminectomy -- not to mention regularly visiting a team of physicians – must be regarded in an assessment the truthfulness of a claimant's allegations. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). The ALJ essentially dismissed it here.

The ALJ only touched on the topic of medications, and in doing so, concluded that they were doing the trick. He said that a February 14, 2006 note from the pain clinic indicated she was getting "outstanding pain relief" from the patch. (R. 24). Actually, the pain clinic note from that date states that Ms. Golzer complained of "constant sharp cramping pain in (R) leg and lower (R) back." (R. 232). A recent epidural had provided no relief. (R. 232). Her pain was even worse when she walked or stood. (R. 232). How that constitutes outstanding relief is unfathomable.

There is another facet of Ms. Golzer's treatment that the ALJ ignored: the side effects of all this medication. There is no denying that strong painkillers like those Ms. Golzer has been on for the last several years often have serious side effects. *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir.2000). The ME testified that while Ms. Golzer was on heavy narcotic medication, she would not be able to be sufficiently attentive to work at a

full-time job. (R. 412). "She'd have less pain . . . but apparently could not function satisfactorily for the task before her." (R. 412). The ME's opinion was essentially that, when Ms. Golzer was sufficiently medicated to allow her to deal with her pain and function, she was too out-of-it to perform a job.

The ALJ neglected to reference this testimony in his opinion. He didn't have to accept it, of course, as long as he explained why. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7ᵗʰ Cir. 2005); 20 CFR §416.927(f). But he couldn't simply ignore it. *Myles v. Astrue*, 582 F.3d 672, 676 (7ᵗʰ Cir. 2009); *Terry v. Astrue*, 580 F.3d 471, 477 (7ᵗʰ Cir. 2009)("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling."). Especially given the fact that he was instructed to consider testimony from a medical expert by the Appeals Council. (R. 289).

Instead, the ALJ adopted the opinion of Dr. O'Laughlin. There's nothing wrong with that but, in this case, given the record leading up to the date of Dr. O'Laughlin's consultative examination on January 11, 2008, that opinion is, at best, a snapshot of Ms. Golzer's progress up to that point. Ms. Golzer applied for benefits in August 2004, meaning that there is a critical period of over three years prior to Dr. O'Laughlin's report in which she may have been disabled.[2] It's entirely possible that she was no longer disabled by January 2008, or by the end of 2007 when she was off of narcotic pain medication, taking Lyrica, and reporting that she was active. On the other hand, Dr. O'Laughlin basically determined what Ms. Golzer could do mechanically, with no

---

[2] SSI benefits are payable as of the claimant's application date. 20 C.F.R. § 416.335 *O'Kane v. Apfel*, 224 F.3d 686, 688 n.1 (7ᵗʰ Cir. 2000).

consideration given to her level of pain. The ME pointed this out in his testimony. And again, there are the side effects from the medication that might limit Ms. Golzer's capacity to maintain the attention required in a sedentary job.

But even if Dr. O'Laughlin's opinion were accepted uncritically, that still leaves open the question of a closed period of disability prior to January 2008. Simply put, Dr. O'Laughlin's opinion in early 2008, when viewed through the lens of all that went before it – Ms. Golzer's treatment, her allegations, her medical record, and the ME's testimony – does not provide substantial evidence to support a decision that Ms. Golzer was not disabled at any point from August 2004 on.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/20/10